Filed 3/18/24  P. v. Cooper CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LLOYD ANTHONY COOPER,<br><br>    Defendant and Appellant. | D082990<br><br><br>(Super. Ct. No. FSB046672) |

APPEAL from an order of the Superior Court of San Bernardino County, Harold T. Wilson, Jr., Judge.  Affirmed.

Melanie L. Skehar, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Melissa Mandel and Elana Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Facing federal removal proceedings following his guilty plea to a sex offense, Lloyd Anthony Cooper unsuccessfully filed a motion to vacate his conviction pursuant to Penal Code section 1473.7.[1]  On appeal, Cooper argues the trial court erred in denying his motion because he proved he did not meaningfully understand the immigration consequences of his plea, and that had he understood those consequences he would not have entered the plea.  He relies on his illiteracy and limited cognitive abilities, a portion of the plea form falsely indicating he could read, and the court's and probation report's discussion of his immigration status.  He also points to the court's exclusion of an expert's report on hearsay grounds regarding his mental functioning and argues that his counsel provided ineffective assistance by failing to call the expert as a witness.  We affirm, as there is insufficient proof that Cooper misunderstood the ramifications of his plea, and the claimed error by his counsel did not impact the outcome of the proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Guilty Plea*

On November 1, 2004, the San Bernardino County District Attorney charged Cooper with four counts of lewd conduct with his stepdaughter, a child under the age of 14, in violation of section 288, subdivision (a).)  Although he subsequently denied the charges, in a recorded phone call with Cooper's then-wife, the victim's mother Jacqueline K. (Jacqueline), Cooper admitted molesting the victim one time.

As the result of negotiations between Cooper's trial counsel, David Goldstein (Goldstein), and the deputy district attorney, Cooper pleaded guilty to one count in exchange for dismissal of the remaining counts.

---

[1]    All subsequent statutory references are to the Penal Code unless otherwise designated.

On November 14, 2005, Cooper executed a "Declaration by Defendant Re: Change of Plea (Guilty)," which was the form used by Cooper's sentencing court to enter felony guilty pleas and to advise defendants of their rights. (Some capitalization omitted.) Cooper, a citizen of Jamaica whose resident alien card had expired, initialed paragraph 14 of that form, which stated, "I understand that if I am not a citizen of the United States, deportation, exclusion from admission to the United States, or denial of naturalization ~~may~~ *will* result from a conviction of the offense(s) to which I plea guilty/nolo contendere (no contest)."[2] Goldstein struck the word "may" and handwrote the word "will" in its place. Cooper also initialed paragraph 21(a), which stated, "I can read and understand English."

Cooper entered his plea at a hearing on November 15, 2005, at which he and Goldstein confirmed they went over both the printed and handwritten portions of the plea form and Cooper understood everything on the form. When asked by the trial court, Cooper confirmed he understood that his conviction "*could*" result in deportation, denial of citizenship, or exclusion from admission into the United States.

The trial court sentenced Cooper two months later and, consistent with his plea bargain, he received 364 days in jail and three years of probation, and the remaining counts were dismissed.

---

[2] A violation of section 288, subdivision (a) is an "aggravated felony" under federal law (8 U.S.C. § 1101(a)(43)(B); *U.S. v. Baron-Medina* (9th Cir. 1999) 187 F.3d 1144, 1147.), subjecting Cooper to mandatory deportation and permanent exclusion from the United States (8 U.S.C. § 1227(a)(2)(A)(iii); *People v. Lopez* (2022) 83 Cal.App.5th 698, 710).

**B.** *Immigration Proceedings*

In 2012, the United States Department of Homeland Security personally served Cooper with a notice to appear stating he was subject to removal as a result of his conviction. Cooper was ordered removed in 2013, but he successfully appealed that ruling in 2014 because the immigration court did not observe the reasonable safeguards Cooper requested to accommodate his limited cognitive functioning. The matter was remanded to a different immigration judge with instructions to apply the safeguards identified by Cooper.

The record indicates the latest hearing in Cooper's immigration proceedings was set for October 11, 2022, but it is silent as to the result of that hearing or the status of the proceedings. Nonetheless, Cooper asserts in his brief that he is still waiting for new hearing to be scheduled, and the People do not contest that assertion. Given the lack of any dispute on the issue, we presume Cooper's immigration case is still pending.

**C.** *Section 1473.7 Motion*

After completing his sentence and probation, Cooper filed a motion to vacate his conviction pursuant to section 1473.7 in July 2021. He argued he did not understand the consequences of his guilty plea because he was cognitively challenged and illiterate, and Goldstein failed to adequately advise and represent him. Cooper filed his own declaration in support of the motion confirming his Jamaican citizenship and his arrival in the United States on an immigrant visa.[3] He declared he was illiterate,[4] he could not

---

[3] Although Cooper's declaration states that he arrived in the United States in 1998, his counsel indicates the date was a typographical error. Other portions of the record reflect that he came to this country in December 1988.

4

understand and respond to situations like normal people, and he did not meaningfully understand the immigration consequences of his plea.

Cooper also submitted two reports from psychologists to support his motion. The first is from Dr. Kristina Roberts, who evaluated Cooper's intellectual functioning, mental status and cognitive abilities on February 25, 2013. Dr. Roberts determined Cooper's intellectual functioning is in the "mildly-mentally retarded range," and "his approximate mental functioning would be equivalent to an 8-12 year old [*sic*] child." While Cooper possessed "functional adaptability, allowing him to live independently and maintain employment," Dr. Roberts believed "he will likely be unable to reason the consequences of his actions at a higher level of functioning," and "he is unable to reason abstractly."

The second report is from Dr. Michael E. Kania, who evaluated Cooper on October 4, 2005, to determine if he suffered from pedophilia. Kania reported that prior to moving to the United States at the age of 22, Cooper took special education classes in Jamaica, never learned to read, and never graduated high school. Cooper nonetheless began living independently at the age of 23, and he was able to maintain employment at a Mervyn's warehouse for nine years without any problems. Kania determined that "Cooper's cognitive functioning is intact for the most part," and he "appears to be functioning in the low-normal range intellectually," which "may be a result of limited education." Kania also noted that Cooper "has some difficulty understanding questions" at times, and "at other times his thinking is somewhat concrete."

---

4     Cooper testified at the hearing on the motion that his sister and second ex-wife read him this declaration before he signed it.

Cooper also submitted support letters from his mother, four siblings, a brother-in-law, and a niece, all of whom live in the United States. Generally attesting to Cooper's character, these letters indicate he has been able to achieve success and provide for his family despite having a learning disability, with one describing him as "very intelligent."

Finally, Cooper relied on the probation report from his sentencing, which indicated that he could not read or write. He claimed the report implied he might be able to avoid deportation because it recommended that if probation is granted, Cooper serve 365 days in jail "until such time as the Department of Homeland Security is able to either verify the defendant's status as being legal, or the defendant is deported."

## D. *Evidentiary Hearing*

Goldstein, Cooper, and Jacqueline testified at the September 16, 2022 hearing on Cooper's motion to vacate his conviction and withdraw his plea.

### 1. *Goldstein's Testimony*

Goldstein was an experienced criminal defense attorney, representing many clients with intellectual disabilities, and in 2004 and 2005 he routinely took special care to advise noncitizen clients concerning possible immigration consequences. He knew Cooper had challenges with his ability to read, but he did not see any other obvious signs of disability, and he relied on verbal communication for all purposes in his representation of Cooper. Cooper's family members were usually present when Goldstein met with him, and they were present when he and Goldstein went through the plea. Goldstein discussed Cooper's immigration status with Cooper and his family, and either Cooper or his family members told Goldstein that they were also working with an immigration attorney.

6

Goldstein spent a meaningful amount of time with Cooper discussing the nature of his plea and how it would affect his immigration chances. He struck "may" and replaced it with "will' in paragraph 14 of the plea form because Cooper would get deported based on the nature of his offense, and he needed to be so advised. After Goldstein explained this consequence to Cooper in very clear terms, Cooper did not show the slightest misunderstanding. Goldstein also believed that based on his custom and practice, he read and explained paragraph 21(a) regarding English proficiency and Cooper affirmed his understanding by initialing that paragraph.

Cooper's potential sentence was approximately 14 years in prison, and Goldstein felt fortunate to get a disposition that did not involve prison time. Goldstein believed he could not get a better deal regarding immigration, and that Cooper's immigration consequences were part of the reason the deputy district attorney agreed to the disposition.

2. *Cooper's Testimony*

The parties agreed that Cooper's declaration attached to his motion would be submitted as his testimony, and his live testimony was limited to cross and re-direct examination. Cooper affirmed he cannot read or write, but his live testimony otherwise provided limited information as he expressed difficulty with memory. When asked if he remembered pleading guilty in 2005, Cooper responded, "I don't know what to say." He did recall coming to court in 2005 and having one of his sisters come with him. Cooper was unable to state the number of years he worked at Mervyn's, but did verify he worked there for a while offloading trailers. All he was able to remember regarding his immigration proceedings was that immigration officials came

7

and picked him up, and his second ex-wife hired an immigration attorney. He could not recall when these incidents happened.

### 3. *Jacqueline's Testimony*

Cooper and Jacqueline lived together for approximately seven or eight years, and they divorced in 2006 as a result of the charges filed against Cooper. Cooper could not read or write, but he spoke fluent English and never needed someone to explain things to him. He was able to take care of himself and independently performed daily tasks such as cooking, driving, and managing the couple's differing work schedules while taking care of their two children and Jacqueline's daughter. Jacqueline worked with Cooper at Mervyn's store, where he was employed fulltime for approximately six years and competently operated a scan gun on which he typed in information such as addresses of stores and the size and color of merchandise.

## E. *Trial Court's Ruling*

After sustaining the People's hearsay objection to Dr. Roberts's report, the trial court admitted the remainder of the exhibits submitted with the motion. Although the prosecutor argued that the motion was untimely, the trial court implicitly disagreed and addressed the merits. Citing Goldstein and Jacqueline's testimony and the modification of paragraph 14 of the plea form, the court found that Cooper understood the immigration consequences of his plea and denied the motion.

## DISCUSSION

We begin with section 1473.7, first disposing of the assertion that Cooper's motion was untimely, and then finding that Cooper failed to carry his burden of showing he did not meaningfully understand the immigration consequences of his plea. We then reject Cooper's claim of ineffective assistance of counsel, finding it fails for lack of prejudice.

8

**A.     *Section 1473.7***

"[S]ection 1473.7, which was enacted by the Legislature in 2016 and became effective on January 1, 2017, created a new avenue of postconviction relief for noncitizens who pleaded guilty to a crime without fully comprehending the immigration consequences that might follow." (*People v. Alatorre* (2021) 70 Cal.App.5th 747, 752, fn. omitted (*Alatorre*).)  The court shall vacate a conviction under section 1473.7 if the moving party shows, by a preponderance of the evidence, that his or her conviction is "legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subds. (a)(1), (e)(1)–(4).)  The moving party must also show the challenged conviction "is currently causing or has the potential to cause removal or the denial of an application for an immigration benefit, lawful status, or naturalization." (*Id.*, subds. (e)(1).)

We independently review the denial of a motion under section 1473.7. (*People v. Espinoza* (2023) 14 Cal.5th 311, 319 (*Espinoza*).)  Under this standard, we exercise our " ' "independent judgment to determine whether the facts satisfy the rule of law." ' " (*Id.* at pp. 319–320.)  We "must give deference to the trial court's factual determinations if they are based on ' " 'the credibility of witnesses the [superior court] heard and observed.' " ' [Citation.]  But when the trial court's findings 'derive entirely from written declarations and other documents,' the trial court and the reviewing court ' "are in the same position," ' and no deference is owed." (*Id.* at p. 320.)

1.     *Timeliness*

Relying on the January 1, 2019 effective date of a recent amendment to section 1473.7 as the triggering event for timeliness purposes, the People

9

argue Cooper's motion was untimely because it was filed two and a half years later. Cooper contends the triggering event for timeliness is a final removal order, and because no such order has been issued, his motion is timely.

When a motion under section 1473.7 is based on immigration consequences, it is presumptively timely if the moving party is no longer in custody. (*Id.*, subd. (b)(1).) It may be deemed untimely, however, if "not filed with reasonable diligence after the later of" (1) the initiation of immigration court proceedings against the party, (2) the denial of an immigration benefit, or (3) a final removal order. (*Id.*, subd. (b)(2).) We have described this standard as "strikingly generous," as the moving party's "reasonable diligence is measured from the *later* of three possible triggering events." (*Alatorre, supra,* 70 Cal.App.5th at pp. 758–759.) "Under this framework, the same petitioner could receive notice to appear in immigration court (§ 1473.7, subd. (b)(2)(A)), and do nothing at all for months, or even years, until a final removal order is issued." (*Alatorre,* at pp. 758–759.)

Cooper's situation is like the hypothetical we posed in *Alatorre.* A final removal order has not been issued in his ongoing immigration proceedings, and the statute allows Cooper to delay seeking relief until he receives notice of such an order. Because Cooper has the ability to file a timely motion in the future, we decline to find the current motion untimely.[5]

2. *Merits of the Motion to Vacate*

We now turn to the merits of Cooper's motion to vacate his conviction, in which he claims a reduced ability to comprehend the plea based on his illiteracy and cognitive disability. He also argues his initialing of paragraph

---

[5] We also note that the People's reliance on the effective date of an amendment to section 1473.7 as the triggering event for timeliness is misplaced, as we recently rejected a similar approach employed by the trial court in *Alatorre.* (*Alatorre, supra,* 70 Cal.App.5th at p. 760.)

21(a), which inaccurately stated he could read, demonstrates he did not understand what he was signing. He further notes that the discussion of his immigration status orally by the court and in the probation report implied he might be able to avoid deportation.

To prevail under section 1473.7, Cooper must show by the preponderance of the evidence that (1) he did not meaningfully understand the immigration consequences of his plea; (2) his misunderstanding was prejudicial; and (3) his conviction is either causing or could cause removal or the denial of an immigration benefit, lawful status, or naturalization. (§ 1473.7, subds. (a)(1), (e)(1)–(2).) We focus our analysis on the first of these three requirements because the trial court found that Cooper failed to carry his burden of showing he misunderstood that his plea subjected him to mandatory deportation.

"[A] petitioner's own subjective error qualifies for relief under the statute if the evidence shows he or she misunderstood the immigration consequences of a plea deal." (*Alatorre, supra,* 70 Cal.App.5th at p. 769.) "Under this principle, the 'error' is that the petitioner subjectively misunderstood the immigration consequences of the plea, and there is no additional need to establish this mistake was caused by some 'third party.' " (*Ibid*.)

At the outset, we note the trial court made a factual finding that both Goldstein and Jacqueline were credible witnesses, as it relied on their testimony over Cooper's in finding that Cooper understood the consequences of his plea. We must defer to that assessment.

As for Cooper's illiteracy, Goldstein knew Cooper had challenges with his ability to read, and he therefore relied on verbal (rather than written) communication for all purposes. Goldstein took the additional step of

11

modifying paragraph 14 of plea form to reflect that immigration consequences were inevitable, and although Cooper may not have been able to read that modification, Goldstein explained it to him in clear terms, after which Cooper did not show the slightest misunderstanding and he initialed the paragraph. Accordingly, while Cooper may be illiterate, that does not appear to have interfered with his understanding of the consequences he faced by pleading guilty.

Turning to Cooper's cognitive abilities, Dr. Kania, who examined Cooper near the time of his plea, found him to be in the low-normal range intellectually with cognitive functioning that is primarily intact. While below average, this diagnosis does not describe a person who is so cognitively impaired as to be unable to understand that a guilty plea would result in deportation. Further, based on Jacqueline's testimony and the family support letters describing Cooper as a fully functioning adult capable of achieving success and supporting his family, with one letter even describing Cooper as "very intelligent," we are not convinced that Cooper lacked the basic cognitive ability to understand that his guilty plea would lead to removal from this country.

It is also significant that Goldstein advised Cooper in the presence of his family members, who were aware of Cooper's cognitive abilities and illiteracy, and were thus available to assist him. Cooper or his family members also told Goldstein they were working with an immigration attorney at the time of the plea, indicating at a minimum an awareness that this case could have adverse immigration consequences. Additionally, none of the support letters from Cooper's family state that he misunderstood how his plea would affect his immigration status, instead asking for leniency based on Cooper's character and ties to the United States.

12

Further, misunderstanding of immigration consequences can be shown through postconviction conduct that is inconsistent with a person's immigration status. (See, e.g., *Espinoza, supra,* 14 Cal.5th at p. 320 [becoming well-known in the community and taking an international commercial flight to the United States was inconsistent with the behavior of a person who understood that his convictions effectively ended his lawful resident status]; *Alatorre, supra,* 70 Cal.App.5th at p. 770 [finding misunderstanding based on the defendant's attempts to become a naturalized citizen after his deportable conviction].) Cooper has not identified any actions he took after his conviction that were inconsistent with his deportable status, such as attempting to renew his resident alien card that expired before he entered his plea.

Cooper's reliance on the probation report's discussion of his immigration status is unconvincing. He did not declare or testify that the report confused him, nor could he have independently relied on it because he is unable to read. There is also no indication that Goldstein relied on the probation report's equivocal provisions in advising Cooper, as Goldstein's testimony indicates he explained to Cooper deportation was certain to occur.

As for the trial court's discussion of immigration consequences, it first emphasized the importance of Goldstein's advice by confirming that Cooper went over all the printed and handwritten portions of the plea form with Goldstein, they had sufficient time to discuss the consequences of his plea, and Cooper understood everything in the form. While the trial court's subsequent question, in which it asked Cooper if he was aware his conviction "*could*" result in immigration consequences, suggested those consequences might not be certain, Cooper did not declare or testify that he relied on the phrasing of that question or that it caused him any confusion. Additionally,

"in evaluating whether the defendant is entitled to relief under section 1473.7, ' " ' " '[t]he defendant can be expected to rely on counsel's independent evaluation of the charges' " ' " rather than the generic statements in the [plea form] and plea colloquy.' " (*People v. Curiel* (2023) 92 Cal.App.5th 1160, 1175.) In light of all the evidence described above, including our deference to the trial court's assessment of Goldstein's testimony, it is not more likely than not that Cooper misunderstood the ramifications of his plea based on the phrasing of the trial court's question.[6] (See *People v. Rodriguez* (2021) 60 Cal.App.5th 995, 1003 [" 'A fact is proved by a preponderance of the evidence if . . . it is more likely than not that the fact is true.' "].)

The same applies to paragraph 21(a) of the plea form, in which Cooper acknowledged he could "read and understand English." Although this paragraph is inaccurate regarding Cooper's ability to read, it is simply outweighed by the other evidence, particularly Goldstein's testimony regarding paragraph 14 of the plea form, which addressed the pertinent issue of Cooper's understanding of his immigration consequences.

Cooper's appellate counsel understandably emphasizes that he no longer has any immediate family members in Jamaica, suggesting he must not have understood the real impact of his decision to plead guilty. We are not unsympathetic to his plight, but our inquiry is a limited one. Based on the totality of the evidence and the trial court's crediting of Goldstein and Jacqueline's testimony to which we must defer, Cooper has failed to show he did not meaningfully understand the immigration consequences of his guilty plea.

---

[6] There was also nothing unusual about the trial court's phrasing of this question, as it followed the statutory admonishment the court was required to give. (§ 1016.5, subd. (a).)

14

**B.** *Ineffective Assistance of Counsel*

Cooper argues his counsel at the section 1473.7 motion hearing was ineffective because he failed to call Dr. Roberts as a witness, resulting in the exclusion of her report as hearsay. He claims no reasonable attorney would fail to arrange for the live testimony of an expert witness, and the trial court would have ruled in his favor had it considered the contents of Roberts's report.

To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) resulting prejudice, i.e., a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.) The second element of prejudice "is a *contextual inquiry* that examines the actual effect of a defense attorney's error on the trial outcome." (*People v. Zaheer* (2020) 54 Cal.App.5th 326, 339.) Focusing on that second element, we find that Cooper's claim fails because he cannot establish prejudice even if his attorney's performance was deficient.

Dr. Roberts examined Cooper more than seven years after his plea, and the trial court questioned the value of later-obtained evidence. On the other hand, the trial court gave great weight to Jacqueline's testimony because she was married to Cooper at the time of his plea, during which she observed Cooper functioning as a normal adult. The trial court also credited Goldstein's testimony, in which he described Cooper as not showing the slightest misunderstanding of the immigration consequences or any signs of disability other than his inability to read. Further, Dr. Kania, who examined Cooper one month before the plea, found Cooper to have a higher level of mental functioning than did Dr. Roberts. Under these circumstances, it is

reasonably likely the trial court would have found that Roberts's opinion was outweighed by the contemporaneous evidence of Cooper's cognitive abilities at the time of his plea.

Additionally, Dr. Roberts's opinion that Cooper was in the "mildly-mentally retarded range" is not necessarily inconsistent with a finding that Cooper understood the effect of his conviction. Cooper's immigration consequences were not a complex concept, as it was a simple matter of cause and effect to understand that Cooper's conviction *would* lead to deportation. The plausible basis for a misunderstanding lies in the explanation of the immigration consequences, and the trial court's acceptance of Goldstein's testimony shows it found those consequences were sufficiently explained.

Based on the foregoing, it is not reasonably likely that the admission of Dr. Roberts's report or testimony would have produced a more favorable result for Cooper. As such, Cooper has failed to establish ineffective assistance of counsel.

## DISPOSITION

The order is affirmed.

DATO, J.

WE CONCUR:

IRION, Acting P. J.

DO, J.

16